In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 25-2021

IN RE: BERNARDO ROMERO,

*Debtor.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division-BK.
No. 24-15301 — **Donald R. Cassling**, *Bankruptcy Judge.*

_____

ARGUED FEBRUARY 13, 2026 — DECIDED JULY 16, 2026

_____

Before BRENNAN, *Chief Judge*, and HAMILTON, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Once again we return to the complexities at the intersection of Illinois property tax sales and bankruptcy law. In 2014 we held in *In re LaMont* that a so-called property tax purchaser "holds a secured claim" in a Chapter 13 bankruptcy. 740 F.3d 397, 411. The questions now before us emerged in *LaMont*'s wake and require us to interpret and apply § 511(a) of the Bankruptcy Code. At the threshold we must decide whether a purchaser's secured claim qualifies as a "tax claim" within the meaning of 11 U.S.C. § 511(a) and, if so, what rate of interest applies to the claim under "applicable nonbankruptcy law." The bankruptcy court answered the first question in the affirmative and con-

cluded that the applicable interest rate is 18% and comes from
35 ILCS 200/21-15 of the Illinois Property Tax Code. We af-
firm.

## I

Bernardo Romero owns a home in Chicago and therefore
within Cook County. The County assesses annual taxes on
residential properties. And, for its part, Illinois law automati-
cally imposes a lien on properties beginning on January 1 of
the year property taxes begin to accrue, with payment of the
taxes extinguishing the lien. See 35 ILCS 200/21-75. But
Romero did not pay his property taxes from 2018 to 2021, so
Cook County continued to hold a lien.

As the holder of a lien, Cook County had avenues to try to
recoup the property taxes Romero owed. Illinois law author-
izes a county to eventually foreclose on the property or, as it
did here, conduct an annual tax sale. See 35 ILCS 200/21-75,
200/21-205. A tax sale is akin to a company factoring a receiv-
able—it is a way for a county to receive cash by effectively
transferring to a third party (the tax purchaser) the right to
receive payment made by the property owner. We described
this process in detail in *LaMont*. See 740 F.3d at 400–01.

On November 10, 2021, Corona Investments acquired at a
tax sale what Illinois law calls a Certificate of Purchase for
Romero's property. See 35 ILCS 200/21-250. The Certificate of
Purchase gave Corona the right, subject to various conditions,
to take title to Romero's house after a prescribed waiting pe-
riod. See *LaMont*, 740 F.3d at 400–01 (collecting state statutes).
Before that time, however, Illinois law allowed Romero to re-
deem his property by paying Corona "all amounts due
(which includes everything [Corona] paid to the county plus

any penalty interest)." *Id.* The redemption process is the way property owners can keep their homes.

All of this meant that Romero had until October 22, 2024 to pay his outstanding property taxes and redeem his home. But one week prior to that date, and surely owing to his lack of sufficient funds, he filed for Chapter 13 bankruptcy. The bankruptcy filing and its timing had consequences. Perhaps foremost, the filing triggered application of the Bankruptcy Code's automatic stay and prevented Corona Investments from petitioning under Illinois law for a tax deed to obtain title to Romero's home. See 11 U.S.C. § 362(a). The Chapter 13 filing, in short, allowed Romero to keep his home during bankruptcy and stave off any effort by Corona to take title to it.

Romero's Chapter 13 filing had another consequence. It resulted in Corona Investments holding a secured claim of $26,134.95 (from the tax sale) in the Chapter 13 proceeding. See *LaMont*, 740 F.3d at 409 (concluding that the tax purchaser's "claim is secured by the debtors' property" and therefore qualifies as a "secured claim" in the Chapter 13 bankruptcy). As someone seeking to adjust his debts under Chapter 13, Romero needed to propose a plan addressing all claims of his secured creditors. His plan had to provide that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii). Debtors wishing to pay secured creditors under a new installment schedule, as opposed to in a lump sum upon plan confirmation, will also owe interest to compensate the creditor for delayed payment. See *Till v. SCS Credit Corp.*, 541 U.S. 465, 474 (2004) (explaining that because

a "debtor's promise of future payments is worth less than an immediate payment of the same total amount" upon plan confirmation, and because "there is always some risk of non-payment," a Chapter 13 debtor will owe interest to secured creditors).

On this much the parties agree. What they dispute is the interest rate applicable to the amount Romero owes Corona Investments on its secured claim. We granted interlocutory review under 28 U.S.C. § 158(d)(2)(A) to resolve this question.

## II

### A

We begin by discerning the nature of the claim Corona Investments held in Romero's Chapter 13 bankruptcy. The characterization informs where we look for the applicable interest rate.

The bankruptcy court concluded that Corona held a "tax claim" within the meaning of § 511(a) of the Bankruptcy Code. This determination meant, by further application of § 511(a), that "applicable nonbankruptcy law" would determine the rate of interest on Corona's secured claim.

Section 511(a) of the Bankruptcy Codes provides the following:

> If any provision of this title requires the payment of interest on a tax claim or on an administrative expense tax, or the payment of interest to enable a creditor to receive the present value of the allowed amount of a tax claim, the rate of interest shall be the rate determined under applicable nonbankruptcy law.

While the parties agree that Romero owes interest on Corona Investments' secured claim, they dispute whether the firm holds a "tax claim" within the meaning of § 511(a). Congress left the term undefined. But the Bankruptcy Code does define the more general term "claim" as either a "right to payment … or … right to an equitable remedy for breach of performance if such breach gives rise to a right of payment" in a vast array of circumstances. 11 U.S.C. § 101(5). This broad definition covers many rights to payment. See *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) ("Congress intended by this language to adopt the broadest available definition of 'claim.'"). And we see no indication that Congress intended in § 511(a) to do anything other than extend that broad definition to a particular type of claim—a "tax claim."

But that observation does not resolve the question before us because Corona Investments is not itself a taxing authority. So, if Corona holds a "tax claim," it does so indirectly—as a result of acquiring, through Cook County's tax sale, a right to receive Romero's payment of his overdue property taxes. In our view, Corona's right suffices to give it a "tax claim" within the meaning of § 511(a).

Our decision in *LaMont* reinforces this conclusion. There we determined that, through its tax sales and conveying of Certificates of Purchase, Illinois law gives tax purchasers (like Corona Investments here) "an unusual tax lien." *LaMont*, 740 F.3d at 406. We further concluded that the tax purchaser held "a claim against the debtors that may be treated in bankruptcy." *Id.* at 409 (citing *Johnson*, 501 U.S. at 84). Connecting the dots, then, *LaMont* all but tells us that Corona holds a tax claim. To conclude otherwise would disregard the nature and character of what Corona acquired in the tax sale.

The question becomes what interest rate applies to Corona's tax claim.

B

Section 511(a) tells us that "applicable nonbankruptcy law" supplies the interest rate. That phrase is not one that rolls off the tongue or, in isolation, supplies clear guidance. What the language tells us to do is to look outside of the Bankruptcy Code for "applicable" law supplying an interest rate for Corona's secured claim. That law could be state law or federal law; it just cannot be bankruptcy law. Cf. *Patterson v. Shumate*, 504 U.S. 753, 759 (1992) (interpretating § 541(c)(2) of the Bankruptcy Code and reasoning that "applicable nonbankruptcy law" as used there included federal law).

No source of Illinois law directly answers the question before us: no statute, regulation, or case law speaks to the precise issue. This absence of a clear and direct answer has led bankruptcy courts to canvass a range of provisions within the Illinois Property Tax Code, with recent decisions concluding that 35 ILCS 200/21-15 supplies the best answer. We agree.

The easiest way to see how we arrive at this conclusion is by a process of elimination that, in the end, returns us to reasoning in our prior decision in *LaMont*.

**35 ILCS 200/21-355 (Redemption Rate—12%):** Illinois law authorizes a tax purchaser to receive a "12% penalty on each amount so paid for each year or portion thereof intervening between the date of that payment and the date of redemption." 35 ILCS 200/21-355(c). Put more simply, § 200/21-355 provides that Romero, had he sought to come current on his overdue property taxes, could have redeemed his property by paying not only the unpaid taxes but also 12% interest on that

amount. Of course, we know Romero did not redeem his property. He instead filed a Chapter 13 bankruptcy petition. Both parties agree that, because no redemption occurred, the 12% redemption rate supplied by 35 ILCS 200/21-355 neither informs nor resolves the question before us. We too agree, as it makes little sense to select a rate that has no application to the facts before us, either directly or by analogy.

*Till* **Rate (Varies Depending on Market and Risk Premium):** In *Till v. SCS Credit Corporation*, the Supreme Court acknowledged that Chapter 13 of the Bankruptcy Code did not provide guidance for determining the interest rate applicable to a secured creditor's claim. See 541 U.S. at 473–74. It therefore adopted a "formula approach" through which a bankruptcy court would begin with the national prime rate and adjust it to account for any given debtor's risk of nonrepayment. *Id.* at 479–80. Romero contends that, because Illinois law does not supply an interest rate for Corona's tax claim, we should leave the determination to the bankruptcy court under the process outlined in *Till.* We decline the invitation, as any *Till* rate is, by definition, the product of applying bankruptcy law, not Illinois law. This matters because § 511(a) requires bankruptcy courts to use "applicable nonbankruptcy law" to determine the interest rate for a "tax claim." So we see no basis for using the *Till* process to yield the rate applicable to Corona Investments' tax claim.

Even more, Congress enacted § 511(a) after (and, perhaps in part, in response to) *Till.* See Jaime M. Nies, Annotation, *Construction and Application of 11 U.S.C.A. § 511(a) Providing for Rate of Interest on Tax Claim*, 93 A.L.R. Fed. 2d 151 § 2 (2015) (explaining that Congress enacted § 511(a) in "the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 to

simplify the interest rate calculation for tax claims"). So it seems very odd and ill-fitting to use the *Till* rate to answer the question presented. Even a court applying a minimal interest rate to a "tax claim" did not use *Till*. See *In re Bowers*, 759 F.3d 621, 628 (6th Cir. 2014) (applying the 0.25% interest rate found on the tax certificate). Indeed, even though he urges adoption of the *Till* rate, Romero is unable to point us to any circuit court concluding that the *Till* rate should be applied to a "tax claim" within the meaning of § 511(a).

**35 ILCS 200/21-15 (Delinquent Tax Rate—18%):** Counties that forego tax sales continue to accrue interest on any unpaid taxes. See 35 ILCS 200/21-15. In those circumstances, Illinois law provides that the applicable interest rate, in Cook County for the relevant years, is 18% annually. See *id.* ("For property located in a county with 3,000,000 or more inhabitants, the unpaid taxes shall bear interest at the rate of … 1.5% per month, or portion thereof, if the unpaid taxes are for a tax year before 2023…."). We find this point most relevant because when a tax purchaser like Corona Investments obtains a Certificate of Purchase, it effectively steps into the position of the county. More specifically, the tax purchaser is the one who will ultimately receive any payment of the overdue taxes. Further, the tax purchaser acquires a right, much like the one the county held before the tax sale, to dispossess the owner of the property upon the completion of certain steps and the passage of a prescribed period of time. See *Lamont*, 740 F.3d at 409 ("[T]he tax purchaser still owns, as modified, the county's equitable remedy against the property for nonpayment of taxes."). Indeed, to obtain a tax deed, the tax purchaser continues in "the same proceeding that the county brought for a judgment and order of sale" that the county began when it

held a tax sale and issued a Certificate of Purchase. *LaMont*, 740 F.3d at 408.

In these circumstances, we conclude that the acquisition of a Certificate of Purchase situates a tax purchaser like the county as the underlying and originating taxing authority. It is observations like these that led us in *LaMont* to say that tax purchasers "stand[] in the shoes of the county." *Id.*

To be sure, the comparison is imperfect. A tax purchaser and a county are not positioned in identical ways with identical rights within the Illinois property tax scheme. Specifically, the tax purchaser is not the county's subrogee. For example, property owners who find themselves able to pay overdue property taxes do so by paying the county directly. See 35 ILCS 200/21-15. And this path of payment seems to remain even after a county effects a tax sale: the tax purchaser generally receives payment indirectly through the county, not directly from the property owner. See 35 ILCS 200/21-355; Jeffrey S. Blumenthal & David R. Gray, Jr., *Real Estate Taxation: Assessments, Rate Challenges, and Tax Sale Matters* § 6.68 (Ill. Inst. for Continuing Legal Educ. 2024) ("The tax purchaser or assignee may then surrender the certificate of purchase to the clerk for cancellation, receiving in return the redemption money less any fees for processing the cancellation.").

Further, the county may in some circumstances recover for unpaid property taxes through an action brought directly against a property owner (in an *in personam* action). See *Griffin v. Gould*, 391 N.E.2d 124, 125 (Ill. App. Ct. 1979) ("An owner of real property on January 1 of a given year is personally liable for the real estate taxes for that year…."). But Illinois law limits tax purchasers to taking title to the taxpayer's property by pursuing a tax deed (in an *in rem* action). See *A.P. Proper-*

*ties, Inc. v. Goshinsky*, 714 N.E.2d 519, 522 (1999) ("[N]o set of facts exists or could exist that would allow [the tax purchaser] to collect money from [the property owner]."). And, upon taking title, Illinois law allows a tax purchaser to keep any equity in the property in question. See Blumenthal & Gray, *Real Estate Taxation* § 7.30 ("If a property value exceeds the taxes due, the owner loses this surplus upon recording a tax deed."). The county, on the other hand, may recoup through foreclosure only its losses. See *Tyler v. Hennepin County*, 598 U.S. 631, 639 (2023).

Finally, a county has 20 years to collect unpaid taxes, while the tax purchaser must, shortly after the redemption period of a few years, either take steps to exercise his right to a tax deed or abandon his claim entirely. See 35 ILCS 200/20-190, 200/21-385(b).

Our point here is no more than acknowledging that tax purchasers and counties are not situated exactly the same way within Illinois' complex property tax scheme. But they do not need to be for us to resolve the question before us. Above all else, we see Corona Investments' tax claim as rooting itself in a right to collect Romero's overdue property taxes plus some amount of interest. This is sufficiently analogous to the situation Cook County would find itself in had there been no tax sale or had Corona taken steps, following Romero's bankruptcy filing, to return its claim to the county. See 35 ILCS 200/21-310(b)(1) (permitting tax purchasers to pursue a declaration that the sale is a sale in error if the owner of a subject property files for Chapter 13 bankruptcy). Were a court to declare the sale to be in error, Corona Investments would receive a refund of its purchase price with no interest, see 35 ILCS 200/21-315(b), with Cook County usually then again be-

coming entitled to any payment of the overdue taxes plus 18% interest, see Blumenthal & Gray, *Real Estate Taxation* § 6.62 (observing that in the case of a sale in error, "the property usually becomes tax delinquent again"); 35 ILCS 200/21-15.

In the final analysis, then, we conclude that the best answer to what interest rate applies to a "tax claim" under § 511(a) comes from the "nonbankruptcy law" supplied by the Illinois General Assembly in 35 ILCS 200/21-15. That rate, in this instance, is 18% per year—a conclusion that aligns with recent bankruptcy court decisions that have confronted this same knotty question at the intersection of the Illinois Property Tax Code and the Bankruptcy Code. See, *e.g.*, *In re McGuire*, 653 B.R. 558, 561 (Bankr. N.D. Ill. 2023); *In re Drake*, 638 B.R. 96, 104 (Bankr. N.D. Ill. 2022).

### III

One final point warrants attention. Over three months after oral argument, Romero filed a motion to strike portions of Corona Investments' appellee brief, and in the alternative moved for sanctions, due to the inclusion of quotations alleged to be the fruit of artificial intelligence hallucinations. We ordered Corona to respond. After reviewing the submissions, we stop short of striking Corona's brief or imposing sanctions. As Romero candidly acknowledges, any errors may reflect a lack of care on Corona's part, but they did not materially affect the presentation of the appeal. Suffice it, then, to lodge a general reminder that the court expects members of our bar to exercise care and diligence in preparing their briefs to ensure complete factual and legal accuracy.

With those closing observations, we AFFIRM.

HAMILTON, *Circuit Judge*, dissenting. The choice of the correct interest rate here requires the court to pick one of several square pegs to fit into a round hole. The majority, unfortunately, has chosen the worst of the alternatives. It makes Chapter 13 relief more difficult to achieve than it should be. It requires the debtor to pay this oversecured creditor a windfall, an unreasonably high interest rate that bears no connection to the economic realities of the claim and the risks of nonpayment. In fact, for a tax purchaser like Corona, nonpayment is not a risk at all. It's the preferred outcome. I respectfully dissent.

In my view, the majority makes two separate legal errors. In the first place, key features of Illinois law show that the tax purchaser-creditor's interest should not be considered a "tax claim" under 11 U.S.C. § 511(a). Second, even if this were a "tax claim," the majority's chosen 18% interest rate cannot be the "applicable nonbankruptcy law." Outside of bankruptcy, tax purchasers simply do not ever receive that rate of interest—under any circumstances. We should instead apply the default interest rate under the market-based methods approved in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) (plurality).

1. *Not a "Tax Claim"*: The analysis begins with whether the creditor here, Corona, has a "tax claim" within the meaning of 11 U.S.C. § 511(a). It does not. The statute does not define the term, but payments against Corona's claim are not taxes. They do not benefit the county and cannot be used for any public purpose.

Illinois law sets up a system to privatize the collection of delinquent property taxes through a system of tax sales, as the majority has described. At best, Corona's secured claim has

its "roots" in a tax debt that Romero owed to Cook County. See ante at 10. Under Illinois law, however, a tax purchaser like Corona should not be treated as holding a "tax claim" under § 511(a).

Under Illinois law, a tax sale "extinguishes" the county's tax lien, and that lien is *not* transferred to the tax purchaser. *O'Connell v. Sanford*, 256 Ill. 62, 65–66, 99 N.E. 885, 886 (1912). Nor is the tax purchaser a subrogee of the county. *Id.* Rather, the tax purchaser obtains its own new, "unique" statutory bundle of rights. *In re LaMont*, 740 F.3d 397, 406 (7th Cir. 2014). As the majority explains, that bundle differs in significant ways from the rights held by the county, ante at 9–10, but the majority fails to give effect to those differences.

The most basic difference is who benefits from payments. Not Cook County, to whom Romero owed the taxes. The county has already been paid the taxes it was owed. It was paid by Corona, which advanced that money in the hope that it might ultimately be able to obtain a valuable property for the low price of delinquent property taxes, sell it for full market value, and pocket the difference. Payments made to Corona under Romero's Chapter 13 plan will not be used to serve any public purposes.

The majority says on this issue that it is merely "connecting the dots" from our decision in *LaMont*, ante at 5, but I respectfully disagree. We held in *LaMont* that an Illinois tax purchaser has a "claim" that had to be asserted in bankruptcy. We did not decide it was a "tax claim" within the meaning of § 511(a). The tax purchaser in *LaMont* was trying to deny the homeowners the protection of bankruptcy, seeking a tax deed to their home despite the automatic stay in the owners' bankruptcy case. 740 F.3d at 402. We affirmed the

decisions of the bankruptcy court and district court holding that the tax purchaser's interest was a "claim" under bankruptcy law and was subject to the automatic stay, meaning the homeowners could try to protect their home under Chapter 13. *Id.* at 409–10. In reaching that conclusion, we reviewed the Illinois tax sale system and wrote that an Illinois tax purchaser has "an unusual tax lien," *id.* at 406, and that he "stands in the shoes of the county," *id.* at 408. The metaphor does not answer the question we face here.

We explained in *LaMont* that the tax purchaser in essence bought from the county the county's equitable remedy against the property. *Id.* But the tax purchaser actually buys much more than that. The tax purchaser buys the right to benefit from the often-substantial difference between the tax delinquency and the market value of the property. *Id.* at 406. The county itself could not benefit from that difference. *Tyler v. Hennepin County*, 598 U.S. 631, 647 (2023) (county's retention of sale proceeds in excess of tax debt was "taking" that violated Fifth Amendment).

A second significant difference is that whereas a creditor-debtor relationship exists between the county and the homeowner, Illinois law "goes to great lengths to ensure that no such relationship exists between the landowner and the purchaser." *A.P. Properties, Inc. v. Goshinsky*, 186 Ill. 2d 524, 530, 714 N.E.2d 519, 522 (1999).

Because under Illinois law the entity that benefits from a debtor's payments is the tax purchaser, not the county, and because the county's interest is extinguished rather than subrogated to the tax purchaser, which receives its own unique bundle of rights and is obviously unable to levy taxes itself, I would hold that the tax purchaser's interest is not a

"tax claim" at all. Under that analysis, a market interest rate under the *Till* method should apply to protect the value of the creditor's claim without giving it a windfall from an excessive interest rate.[1]

2.   *Not the Applicable Rate*: Still, given some of the language in *LaMont*, I can understand why my colleagues conclude that Corona's interest should be deemed a "tax claim" under § 511(a). Even so, however, the 18% interest rate at which the homeowner's debt to the county accrues before the tax sale cannot be the "applicable nonbankruptcy law" under § 511(a). Under Illinois law, that rate never applies after the redemption period has run. Outside of bankruptcy, a tax purchaser is *never* entitled to that interest rate. *Only* the county can ever receive the 18% interest rate: "All interest collected shall be paid into the general fund of the county." 35 ILCS 200/21-15.

The Illinois Property Tax Code simply does not authorize or even contemplate interest continuing to accrue against the homeowner after the redemption period, during which a homeowner may "redeem[]" her property by making a payment to the county. See § 21-350. Instead, after the

---

[1] These features distinguish an Illinois tax purchaser's interest from the interests of tax purchasers under the laws of other states that have been held to be "tax claims." For example, a tax purchaser in Texas is "subrogated to and is entitled to exercise any right or remedy possessed by the transferring taxing unit, including or related to foreclosure or judicial sale." Tex. Tax Code § 32.065(c). This provision and the notion that the tax claim is *not* "extinguished" under Texas law were critical to the Fifth Circuit's conclusion that a tax purchaser in Texas holds a "tax claim." *Tax Ease Funding, L.P. v. Thompson* (*In re Kizzee-Jordan*), 626 F.3d 239, 244–45 (5th Cir. 2010).

redemption period expires (and unless the homeowner files for bankruptcy), the tax purchaser gains the right to take ownership of the property by obtaining a tax deed. *LaMont*, 740 F.3d at 401. On the other hand, the tax purchaser might instead obtain a declaration of a "sale in error" on the grounds that the homeowner filed for bankruptcy after the tax sale but before the tax purchaser obtains a deed. In that case, the county refunds the tax purchaser only what it has paid, without the 12% interest the county pays to a tax purchaser when a sale in error is declared on some other grounds. §§ 21-310(b)(1), 315(b). The majority is thus "struggling to fit a square peg into a round hole." Amicus Br. at 23.

Between the time of the tax sale and the redemption date, what is effectively interest (called a "penalty" in the statute) on the amount a homeowner must pay to redeem his property accrues under § 21-355(b) & (c). The rates under § 21-355 do not include the 18% rate the county gets before the tax sale. The parties agree that the redemption statute is not the "applicable nonbankruptcy law" (except, in Romero's view, for the few days between his bankruptcy petition and the expiration of the redemption period). Some bankruptcy courts in the Northern District of Illinois have held otherwise. *In re Villasenor*, 581 B.R. 546, 552 (Bankr. N.D. Ill. 2017). Given the parties' positions, though, it would be enough to decide this case to hold that the 18% interest rate is not the "applicable nonbankruptcy law" and that Corona has identified no other candidates for such law. See, e.g., 35 ILCS § 21-315(b) (interest rate on sale in error for reasons other than bankruptcy); 735 ILCS 5/2-1303 (state post-judgment interest rate).

In fact, it appears there simply is *no* "applicable nonbankruptcy law" that sets an interest rate for Corona under these circumstances. Yet a tax purchaser is surely entitled to some interest rate to compensate it for the delayed payment. See 11 U.S.C. § 1325(a)(5)(B) (cramdown provision requires plan to pay the "value, as of the effective date of the plan, of property to be distributed"); *Till*, 541 U.S. at 474 ("A debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment.").

With no "applicable nonbankruptcy law"—a possibility the majority does not appear to consider—the parties and amicus offer no better place to turn than an interest rate under the market methods of *Till*. Those methods would take account of the fact that the tax purchaser here is substantially oversecured. Remember, this whole system of privatizing tax collection works only because the delinquent taxes are secured by the entire property. That gives the tax purchaser the opportunity for a windfall that *Tyler* held the county itself cannot reap. By choosing to apply the 18% rate, the majority gives this oversecured creditor a windfall that bears no relation to the economic realities of its claim. It also makes Chapter 13 bankruptcy relief more oppressive than it should be for Romero and debtors like him.

The well-tested methods under *Till* provide a workable solution unless and until the Illinois General Assembly sees fit to amend somehow its property tax sale procedures in a fashion that creates law that is "applicable" in the situation we face here but "not aimed solely at bankruptcy

proceedings." See *Tennessee v. Hildebrand* (*In re Corrin*), 849 F.3d 653, 658 (6th Cir. 2017).

Finally, I must note that Corona's briefing in this case included an astonishing number of erroneous and even hallucinated citations. While they did not affect the majority's ultimate resolution of the case, the sloppy errors by Corona's lawyer, Paul M. Bach of Bach Law Offices, made this court's work more difficult than it should have been. We should expect and insist on better, more professional performance. Sanctions like those we have imposed in other recent cases involving hallucinated citations from generative artificial intelligence would be appropriate here, regardless of the precise reasons for the many errors. See *Dec v. Mullin*, 171 F.4th 940, 947–48 (7th Cir. 2026); *D'Ambrosio v. Meta Platforms Inc.*, 176 F.4th 928, 945–46 (7th Cir. 2026); *Perez-Castillo v. Blanche*, 177 F.4th 837, 846–48 (7th Cir. 2026).